**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,       ) | |
|               ) | |
|          Plaintiff,    ) | Case No. 2:13-cr-00062-JCM-PAL |
|               ) | |
| vs.              ) | **REPORT OF FINDINGS AND RECOMMENDATION** |
|               ) | |
| KEVIN SALISBURY,       ) | (Mot. Mental Comp. - Dkt. #25) |
|          Defendant.   ) | |
| _____ ) | |

Before the court is the Defendant's Motion for Hearing to Determine Mental Competency to Stand Trial (Dkt. #25). The motion is granted. The court has considered the moving and responsive papers, medical records, reports and testimony at hearings conducted on January 2, 2014, and February 6, 2014. For the reasons explained below, the court finds that Salisbury is competent to stand trial and able to assist his counsel.

**BACKGROUND**

Salisbury is charged in an Indictment (Dkt. #1) returned February 12, 2013, with assault on a federal officer in violation of 18 U.S.C. § 111(a). The indictment arises out of an incident which occurred on November 29, 2012, when Salisbury allegedly assaulted a United States Marshals Service detention officer by striking the victim's face with his arm. Salisbury made an initial appearance, received appointed counsel, and was arraigned on March 22, 2013. He was detained following a detention hearing, pled not guilty and trial was initially set for May 15, 2013. The parties stipulated to continue the pretrial motions, calendar call and trial date. Stipulation (Dkt. #13). Defense counsel represented the discovery in the case was voluminous and he needed additional time to review discovery and try to negotiate the case. *Id*. The district judge granted the stipulation and continued the trial date until August 19, 2013 in an Order (Dkt. #14) entered May 14, 2013.

On July 10, 2013, counsel for Salisbury filed a Motion for Psychiatric Evaluation to Determine Mental Competency to Stand Trial (Dkt. #16).  The motion related that defense counsel had also been appointed to another case in which Salisbury is a defendant in this district, 2:12-cr-00010-GMN-CWH.  In that case, Salisbury is charged with possession of a firearm by a convicted felon.  The Federal Public Defender's office was initially appointed to represent him on that charge.  However, after numerous appearances and potential plea agreements, the Office of the Federal Public Defender was allowed to withdraw as counsel, and on November 27, 2012, Mr. Miceli was appointed to represent Salisbury.  Mr. Miceli was also appointed to represent Salisbury in this case following his indictment on the charge of assault on a federal officer.

The Motion for Psychiatric Examination represented that Mr. Miceli had visited Salisbury at the Nevada Southern Detention Center ("NSDC") on numerous occasions to discuss the facts of his cases and potential plea negotiations.  In May 2013, counsel visited Salisbury at NSDC to potentially finalize plea negotiations.  Salisbury indicated that he wished to resolve his cases with the proposed plea agreements.  Mr. Miceli so advised government counsel who prepared written plea agreements.

Mr. Miceli returned to NSDC to discuss the plea negotiations, and written plea agreements on June 27, 2013, in the late afternoon.  At that time, Mr. Miceli learned that Salisbury was being housed in the medical psychiatric wing of the jail.  During that visit, for the first time, Salisbury stated that there were no charges against him, that he did not know who his counsel was or why counsel was visiting him, and that Salisbury did not belong in custody.  Salisbury claimed that he did not remember ever going to court with counsel or ever meeting counsel.

In an Order (Dkt. #21) entered July 26, 2013, the court granted the motion for a psychiatric examination pursuant to 18 U.S.C. §§ 4241, 4242, 4247, and Rule 12.2(c) of the Federal Rules of Criminal Procedure.  The order directed the United States Marshals Service to transport Mr. Salisbury to a suitable Bureau of Prisons ("BOP") facility that conducts psychological evaluations closest to the court to determine: (1) whether Salisbury was suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him, or to assist properly in his defense; and (2) whether Salisbury suffered from a

/ / /

1  mental disease or defect rendering him mentally incompetent at the time of the commission of the

2  offense charged.

3  Salisbury was transferred to the Metropolitan Corrections Center ("MCC") in San Diego,

4  California, and arrived at the facility on August 8, 2013, for purposes of the court-ordered psychological

5  evaluation.  However, he was uncooperative with MCC staff and refused to participate in the

6  evaluation.  Dr. Alicia Gilbert, Forensic Psychologist, attempted to engage Salisbury in an evaluation

7  on four separate occasions during his time at MCC.  However, although Salisbury sometimes stated he

8  was willing to participate, he ultimately refused to cooperate on all four occasions.  At the conclusion of

9  the evaluation period a Forensic Report (Dkt. #23) was prepared which was forwarded to the court,

10  filed under seal and provided to counsel for the government and counsel for Salisbury.

11  Salisbury was returned to this district and appeared at a status conference on October 8, 2013.

12  *See* Minutes of Proceedings (Dkt. #24).  The court addressed Dr. Gilbert's report that the forensic

13  evaluation could not properly be completed because Salisbury had failed to cooperate, and heard from

14  counsel concerning their proposals on how to proceed.  The court gave counsel one week to file any

15  appropriate motions, and scheduled the matter for a competency hearing on October 24, 2013.  *Id*.

16  Counsel for Salisbury filed the current Motion for Hearing to Determine Mental Competency to stand

17  trial (Dkt. #25) pursuant to Federal Rule of Criminal Procedure 27 [sic] and 18 U.S.C. § 4247(d).

18  Shortly after filing the motion, the parties filed a Stipulation (Dkt. #26) to continue the competency

19  hearing which the court granted.  Order (Dkt. #27).  The competency hearing was continued until

20  November 5, 2013.  On October 24, 2013, counsel for Salisbury filed an ex parte motion for an order to

21  obtain medical records of the Defendant which the court granted in an Order (Dkt. #31) entered October

22  28, 2013.  Counsel for Salisbury also requested appointment of a defense psychiatric expert to examine

23  Salisbury.  The ex parte order to obtain medical records was necessary because Salisbury refused to sign

24  a medical authorization release to allow counsel and his expert to obtain the records.  The parties

25  subsequently stipulated to continue the competency hearing and trial date on November 4, 2013 (Dkt.

26  #34) and November 27, 2013 (Dkt. #37).

27  The court set a status conference on December 3, 2013, after receiving the parties' third

28  stipulation to continue the competency hearing.  Counsel requested the continuance because counsel for

1    Salisbury was requesting that Dr. Norton Roitman be appointed to evaluate Salisbury and more time

2    was needed to get approval and authorization for Dr. Roitman to visit Salisbury at NSDC in Pahrump.

3    Additionally, Dr. Roitman needed time to review the medical records before testifying.

4    An evidentiary hearing on the motion to determine Salisbury's competency began January 2,

5    2014.  Counsel for Salisbury called Dr. Sussman, the primary psychiatrist assigned to NSDC who

6    testified on direct and cross examination and answered the court's questions.  Counsel for Salisbury

7    also called defense psychiatric expert, Dr. Norton Roitman, who testified on direct and cross

8    examination and answered questions from the court.  The hearing was continued at the government's

9    request to call Dr. Alicia Gilbert as a witness on behalf of the government.  Pursuant to the parties'

10   stipulation, Dr. Gilbert appeared at the continued February 6, 2014 competency hearing by video

11   conference.  She testified on direct, cross examination, and also answered questions of the court.

**DISCUSSION**

12

13   **I.    Applicable Legal Standards.**

14   The due process clause of the Fifth Amendment prohibits trying a defendant who is mentally

15   incompetent.  *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *Pate v. Robinson*, 383 U.S. 375, 378

16   (1966).  "A person whose mental condition is such that he lacks the capacity to understand the nature

17   and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense

18   may not be subjected to a trial."  *Drope v. Missouri*, 490 U.S. 162, 171 (1975).

19   The treatment of offenders suffering from a mental disease or defect is governed by the Insanity

20   Defense Reform Act of 1984.  18 U.S.C. §§ 4241-48.  The Federal Criminal Code establishes a multi-

21   part statutory scheme for addressing offenders suffering from a mental disease or defect who have

22   pending federal charges.  If a question is raised concerning whether a defendant is competent to stand

23   trial or assist in his defense, the court first determines whether the defendant suffers from a mental

24   disease or defect rendering him mentally incompetent to the extent that he is unable to understand the

25   nature and consequences of the proceedings against him, or to assist properly in his defense.  18 U.S.C.

26   § 4241(a), and (d); *See also United States v. Friedman*, 366 F.3d 975, 980 (9th Cir. 2004).  Section

27   4241(a) provides that whenever the court has reasonable cause to believe a defendant is suffering from

28   a mental disease or defect rendering him unable to understand the nature and consequences of the

1  proceedings against him or to assist properly in his defense, the court shall conduct a hearing to

2  determine the defendant's competency.  Section 4241(d) establishes a two-part disjunctive test of

3  competency.  *Id*.  A defendant must be able both to understand the nature of the proceedings against

4  him, and to assist properly in his defense.  *Id*.

5      Pursuant to 18 U.S.C. § 4241, the accused in a federal prosecution has the burden of proving

6  incompetence by a preponderance of the evidence.  *Cooper v. Oklahoma*, 517 U.S. at 360.  The

7  Supreme Court has held that presumption of competence does not offend any recognized principle of

8  fundamental fairness because such a procedural rule affects the outcome in a narrow class of cases

9  "where the evidence that a defendant is competent is just as strong as the evidence that he is

10  incompetent."  *Medina v. California,* 505 U.S. 437, 449 (1992).

11     In *Dusky v. United States,* 362 U.S. 402 (1960) the Supreme Court held that the test for

12  determining whether a defendant is competent to stand trial is "whether he has sufficient present ability

13  to consult with his lawyer with a reasonable degree of rational understanding–and whether he has a

14  rational as well as factual understanding of the proceedings against him."  *See also Cooper v.*

15  *Oklahoma*, 517 U.S. 348, 356 (1996) (quoting *Dusky* and stating the test for incompetence is well

16  settled).  The Ninth Circuit reviews a district court's determination of a defendant's competency to

17  stand trial for clear error.  *United States v. Gastelum-Almeida*, 298 F. 3d 1167, 1171 (9th Cir. 2002).

18  **II.     Findings and Conclusions.**

19     The court finds that Salisbury has not met his burden of establishing, by a preponderance of the

20  evidence, that he is incompetent to stand trial.  More specifically, the court finds that Salisbury has not

21  shown that he lacks the present ability to consult with his lawyer with a reasonable degree of rational

22  understanding, or that he lacks a rational as well as factual understanding of the proceedings against

23  him.  In reaching these findings, the court has relied on its own interactions with Salisbury in multiple

24  court hearings as well as the court's observations of Salisbury's behavior and demeanor, and the

25  pleadings and docket entries in Salisbury's other pending criminal case, 2:12-cr-00010-GMN-CWH.

26  The court has also relied on the forensic evaluation report prepared by Dr. Gilbert at MCC San Diego,

27  the report of defense psychiatric expert, Dr. Roitman, and the testimony of Dr. Gilbert, Dr. Roitman,

28  / / /

5

1    and Dr. Sussman, at the January 2, 2014 and February 6, 2014 hearings.  These findings are made for

2    the reasons explained more fully below.

3         None of the three testifying experts were willing to offer opinions to a reasonable degree of

4    medical certainty.  With respect to Dr. Gilbert and Dr. Roitman, they were unwilling to provide

5    opinions to a reasonable degree of medical certainty because Salisbury refused to cooperate with their

6    evaluation.  Dr. Sussman has been Salisbury's treating psychiatrist at NSDC where Salisbury has been

7    detained except while at MCC San Diego.  Dr. Sussman testified he has been unable to definitively

8    diagnose Salisbury and treat him because of Salisbury's repeated failures to cooperate with him and

9    medical staff at NSDC.  Dr. Sussman also testified that he and medical staff at NSDC believe Salisbury

10   is malingering for secondary gain, principally to obtain changes in where he is housed.  Although

11   Salisbury has been placed on suicide watch on a number of occasions, neither Dr. Sussman, nor staff,

12   believe that Salisbury was actually suicidal or had made a bona fide suicide attempt.  Salisbury was

13   placed on suicide watch because professional standards require this precaution when someone

14   expresses suicidal thoughts, even if medical staff believe the overall risk of suicide is low and/or no

15   genuine attempt at suicide occurred.

16        Dr. Gilbert prepared a comprehensive forensic evaluation report based on behavioral

17   observations, Salisbury's verbal communication with MCC's staff and review of MCC records during

18   the period of Salisbury's evaluation.  While at MCC San Diego, Salisbury was uncooperative and

19   refused to participate in the evaluation.  Dr. Gilbert attempted to engage Salisbury in the evaluation

20   process on four separate occasions.  Salisbury was informed of the nature and purpose of the court

21   ordered evaluation, and stated he was aware of the evaluation.  He agreed to participate in the process at

22   least twice, but then later refused.

23        When Salisbury initially arrived at MCC San Diego, he refused to answer most of the intake

24   questions, but reported a history of mental health treatment and past suicide attempts, most recently

25   four to six months prior.  He was not on any prescribed medications at the time of transfer.  Eight days

26   later on August 16, 2013, he was seen for a routine physical examination and was described as

27   cooperative, but denied previous mental health treatment and suicide attempts.  On August 26, 2013, he

28   was screened for depression because while seeing the dentist he was difficult to interview, refused to

answer some of the questions about his health and family health, and told the dentist "I know the answer to that question, but I do not like all of these questions." He was described as tearful.

Psychology staff at MCC San Diego saw Salisbury approximately twelve different times outside the evaluation process. He was behaving bizarrely when he was initially seen August 9, 2013 hiding under the bench in a holding tank and refusing to submit to a medical exam. Salisbury stated he had concerns about being housed in general population and claimed he experienced blackouts where he lost time and knowledge of his actions.[1] He told the psychologist he had a history of mental health treatment for "autophobia" which he said was a fear of not knowing what he may do and memory loss. He reported recent suicide attempts by cutting his wrist and hanging six months prior, but denied suicidal ideation at the time of interview. The psychologist described him as alert, oriented, cooperative with adequate grooming and hygiene, appropriate eye contact, clear speech, goal-directed thinking, euthymic mood, and appropriate range of affect. He was placed in the Mental Health Unit ("MHU") as a precaution because of his strange behavior.

On August 13, 2013, he was seen by a staff psychologist and asked to be transferred to a general population housing unit. He claimed that he did not remember hiding under the bench and stated he had dementia and autophobia which was associated with memory loss. The psychologist felt it was highly unlikely given his age that he had dementia, especially because Salisbury claimed he had been diagnosed years prior. Salisbury was alert, oriented, cooperative with a stable mood and congruent affect. Salisbury denied suicidal ideation or auditory and visual hallucinations and no delusional beliefs were noted. The following day Salisbury was again seen by the staff psychologist who attempted to interview him. Salisbury stared at the wall and ignored requests to come to the door to talk with the psychologist. The psychologist returned later in the day and Salisbury asked her why she had not seen him earlier. He claimed not to remember her earlier visit.

---

[1]Dr. Gilbert's forensic evaluation report states that Salisbury stated on August 9, 2013, he had no concerns about being housed in general population. However, this is an apparent typographical error. The BOP record of Salisbury's suicide risk assessment on August 9, 2013 indicates that Salisbury expressed concerns about being housed in general population due to his tendency to "go in and out." The assessment conducted by the psychologist concluded that no suicide attempt had occurred, that Salisbury's overall suicide risk was low, and that a formal suicide watch was not warranted.

On August 19, 2013, a staff psychologist saw Salisbury after he threatened suicide when officers attempted to transfer him to the Special Housing Unit ("SHU") because he had been stealing food items, engaging in disruptive behavior, and walking around naked after taking a shower.  When he arrived at the SHU and was told he would be sharing a cell with another inmate, he told the officer he was suicidal.  However, when the psychologist asked him about it, he claimed he did not remember making this statement and insisted he was not suicidal.  He was transferred back to the MHU for further observation, but not placed on suicide watch.

On August 20, 2013, he was seen by an MHU psychologist and said he refused to "team up with someone", *i.e.*, share a cell.  When told he might be required to share a cell with another inmate based on space needs at the facility, he stated "well then I'll just be suicidal til the day I die."  The psychologist opined that Salisbury's suicidal threats were manipulative and an attempt to secure preferred housing.

During his stay at MCC San Diego, Salisbury made numerous statements and engaged in conduct on multiple occasions designed to have his housing situation changed.  At times he demanded to be returned to general population and at other times wanted to remain in the MHU.  Attempts were made to transfer him to the SHU for various incidents of misconduct.  For example, on September 8, 2013, Salisbury threw his mug at the window of the cell door which cracked and a piece of glass hit the unit officer.  The officer reported Salisbury was angry because he was housed on the intake housing unit and not allowed to take a shower immediately after asking the officer.  He was escorted to the SHU, demanded a single cell, and threatened suicide when told he would not be housed alone.  Salisbury later admitted to the lieutenant that he threatened suicide to get a single cell.  On September 9, 2013, he again stated he would "stay suicidal" to avoid being housed with another inmate.

Dr. Gilbert and staff diagnosed Salisbury with antisocial personality disorder based on staff observations and Salisbury's conduct.  He repeatedly failed to follow facility rules, stole food and commissary items from other inmates, entered restricted areas after repeatedly being told they were off limits, was at times cooperative and then uncooperative, and repeatedly threatened suicide to avoid being housed with another inmate, or to obtain preferential housing.

///

1    Although Salisbury claimed to have memory problems and "autophobia", in contacts with

2    psychology staff Salisbury displayed intact memory and was able to recall the names of his previous

3    and current defense attorneys.  He asked appropriate questions about the evaluation, demonstrated goal-

4    directed thinking with no evidence of disorganized speech or thought disorder, denied visual and

5    auditory hallucinations, and was not observed to respond to any internal stimuli.  He did not exhibit any

6    delusional beliefs other than stating his belief that there were no charges pending against him.  Dr.

7    Gilbert and staff did not consider this delusional thinking because his reported belief was specific to his

8    pending cases, there were no other reported or observed delusional beliefs, and no evidence to suggest

9    he was suffering from a psychotic disorder.

10    Dr. Gilbert concluded that Salisbury's behavior was calculated and intended for secondary gain

11    and that he seemed motivated to avoid all consequences associated with his behavior at the MCC as

12    well as the consequences associated with his charges.  She did not diagnose malingering because she

13    was unable to reach that diagnosis with a reasonable degree of medical certainty because of Salisbury's

14    refusal to participate in the evaluation process which includes objective tests which measure

15    malingering.  Overall, Dr. Gilbert reported Salisbury was arrogant and demanding and gave no

16    consideration to others' personal space or property.  He claimed he was not responsible for his conduct

17    because of his autophobia.  Although Salisbury at times exhibited odd and bizarre behavior, Dr. Gilbert

18    opined that Salisbury's presentation of mental health symptoms and memory loss was contrived and

19    inconsistent with any known mental illness or cognitive disorder.  Dr. Gilbert testified that she was

20    unable to diagnose malingering with a reasonable degree of medical certainty.  However, she also

21    testified that in her opinion, it is more likely than not that Salisbury is malingering, *i.e.,* feigning or

22    exaggerating symptoms of mental illness and memory loss to avoid the consequences of his actions

23    both at MCC and of his pending criminal charges.

24    Dr. Gilbert was also unable to opine to a reasonable degree of medical certainty that Salisbury

25    was able to understand the nature and consequences of the court proceedings against him or to assist

26    properly in his own defense.  However, Dr. Gilbert testified that in her opinion it was more likely than

27    not that Salisbury was both able to understand the nature and consequences of the proceedings against

28    him, and to assist in his own defense.

Defense psychiatrist Dr. Roitman prepared a report and also testified.  Dr. Roitman opined that Dr. Gilbert fairly reported observations, discussions and interactions with Salisbury and was transparent in her qualifications of her findings of suspected malingering, and antisocial personality disorder.  Dr. Roitman had no criticism of Dr. Gilbert's work and "careful arguments supporting her findings."

Dr. Roitman reviewed the medical records and attempted to interview Salisbury at NSDC. Salisbury refused to come out of his cell for the interview.  Dr. Roitman briefly saw Salisbury in his cell.  Salisbury stated he was not charged with anything and refused to answer any of Dr. Roitman's questions.

In his report, and testimony, Dr. Roitman advanced a diagnostic theory which he acknowledged was speculative based on his examination of the medical records.  He concluded that there was ample psychiatric evidence from the records to support a diagnosis of paranoid delusional disorder.  Dr. Roitman's diagnostic theory is that Salisbury's paranoia interferes with his ability to process the legal system.  Dr. Roitman's theory is that Salisbury does not trust anyone and believes that if he refuses to cooperate with staff, other inmates, judges and attorneys, he will avoid the worst and remain in control. Protest and disruption are the only ways for him to fight his adversaries and refusal, denial, resistance and opposition help him define himself and reinforce his sense of autonomy.

In addressing repeated medical references to Salisbury malingering,  Dr. Roitman opined that it was not clear what goal Salisbury was seeking, that is, what secondary gain he hoped to achieve. Malingering is motivated by the hope of gaining something from behavior, such as feigning injury for a financial award.  Salisbury's observed antisocial behaviors do not get him released early, or get him privileges, profit or sympathy.  Therefore, according to Dr. Roitman's diagnostic theory, Salisbury's choices and behaviors make sense if Salisbury believes no one can be trusted.  Salisbury's non-compliance and disruption are ways for him to preserve himself.

The court found the testimony of Dr. Sussman and Dr. Gilbert persuasive, and consistent with the court's own interactions with and observations of Salisbury.  Dr. Sussman, Dr. Gilbert, medical and non-medical staff at both NSDC and MCC believe Salisbury is malingering.  Both Dr. Gilbert and Dr. Sussman testified that Salisbury's reported suicidal attempts were superficial and not genuine.  Both doctors and their staff believe Salisbury's reports of suicidal ideation and transparently superficial

1   behavior suggesting suicide attempts were motivated by his desire to receive preferential housing at

2   NSDC and MCC.  Dr. Gilbert was not willing to offer an opinion to a reasonable degree of medical

3   certainty, but was willing to offer an opinion by a preponderance of the evidence that Salisbury was

4   malingering.  She also testified that Salisbury was, more likely than not, competent to stand trial and to

5   assist his counsel.  Dr. Roitman's elaborate diagnostic theory is based on his review of the medical

6   records, and his brief interview with Salisbury.  Dr. Roitman conceded his theory was speculative.

7       The court has also relied on its own interactions and observations of Salisbury in multiple court

8   hearings in reaching its findings that Salisbury is both able to understand the nature and consequences

9   of the proceedings against him, and to assist his counsel in his defense.  Salisbury appeared for an initial

10  appearance and arraignment and plea in both of his cases, acknowledged receipt of the charging

11  documents, and an understanding of the charges against him.  Salisbury was brought over on a writ of

12  habeas corpus ad prosequendum to make an initial appearance on his felon in possession charge in Case

13  No. 2:12-cr-00010 on January 27, 2012.  The office of the Federal Public Defender was appointed and

14  represented Salisbury until being relieved as counsel at a hearing conducted by the district judge on

15  November 19, 2012.

16       Between the time of his initial appearance and requesting replacement counsel, counsel for

17  Salisbury filed a notice of intent to plead guilty and memorandum in support of guilty plea June 20,

18  2012, which the district judge set for change of plea hearing.  *See* Notice of Intent to Plead Guilty (Dkt.

19  #22 & Memorandum Dkt #23), and Notice of Hearing (Dkt. #24).  At the July 3, 2012 change of plea

20  hearing, counsel advised the court that Mr. Salisbury had changed his mind and wanted to proceed with

21  trial.  *Id*.  The court reset the matter for trial, and the parties stipulated to at least two subsequent

22  continuances of the trial date.  On November 5, 2012, the district judge again received a plea

23  memorandum which resulted in setting the matter for a change of plea hearing.  *See* Minute Order in

24  Chambers (Dkt. #32).  At the November 19, 2012 change of plea hearing, the district judge conducted

25  an ex parte hearing on the Defendant's request to replace the Federal Public Defender as counsel of

26  record.  The court granted the request, and the Federal Public Defender's Office filed a stipulation to

27  continue the trial date for the fifth time based on Salisbury's request for substitute counsel.  *See*

28  / / /

1  Stipulation (Dkt. #33).  Current counsel, Mr. Miceli, was appointed November 27, 2012, in the first
2  filed action, and was subsequently appointed when this case was filed.

3       Mr. Salisbury and Mr. Miceli engaged in multiple meaningful conversations about his cases, and
4  discussed resolution by plea agreement.  Mr. Miceli has reported to the court orally on the record and in
5  writing  that Mr. Salisbury met and conferred with him to discuss his cases many times over the course
6  of his representation.  Mr. Miceli discussed verbal plea negotiations he had engaged in with government
7  counsel with his client.  Mr. Salisbury told Mr. Miceli he was willing to accept the government's offer
8  which resulted in Mr. Miceli communicating with government counsel and  preparation of  written plea
9  agreements.  Mr. Miceli had no question about Mr. Salisbury's competency to stand trial or assist him
10 until the June 27, 2013 visit at the Pahrump facility to go over the written plea agreements. Counsel for
11 both sides advised the court that the written plea agreements contained preliminary sentencing guideline
12 calculations indicating Salisbury was likely to receive a substantial prison sentence. The June 27, 2013
13 visit was the first time Salisbury started making statements that there were no pending federal charges
14 or claimed that he did not know who counsel was or why he was incarcerated.

15      Salisbury has been disruptive on multiple occasions before and during court proceedings.  On
16 one occasion, after return from MCC San Diego, he put his head down on the table, refused to look up,
17 and made snoring noises.  However, he stopped making snoring noises and listened intently when the
18 court discussed with counsel the legal standard, burden of proof, and consequences of a finding of
19 incompetency.  When Salisbury appeared to recognize that the court was observing him, he reverted to
20 transparently feigning not to understand where he was or who was addressing him.  On a subsequent
21 court appearance, the court directly addressed Salisbury and urged him to cooperate with his counsel
22 Mr. Miceli and Mr. Miceli's partner, Mr. Pitaro, who was present in court.  The court advised Salisbury
23 that both were highly skilled, experienced CJA counsel who had his best interests in mind.  When the
24 court began discussing with counsel the fact that a finding of incompetency to stand trial would not
25 dispose of the charges against him, Salisbury spontaneously responded that the doctor had told him he
26 could not stand trial if he was incompetent.  The court inquired what doctor had told him that.
27 Salisbury's body language and facial expressions quite obviously conveyed that he recognized that he
28 / / /

12

1   volunteered too much information, and had responded too cogently.  Salisbury immediately reverted to

2   chanting his mantra that there were no charges against him.

3         At the January 2, 2014 hearing, Salisbury was disruptive.  He interrupted the court, and

4   attempted on several occasions to interrupt the witnesses while testifying.  However, when the court

5   explained that his disruptive behavior would not be tolerated, and that he would be removed from the

6   courtroom if he continued to interrupt, he ceased and listened to the proceedings.  He did need to be

7   reminded more than once.  The court advised him that he had the right to be present in the courtroom,

8   and that the court would prefer that he remain, but that he would be removed and other arrangements

9   would be made for him to listen to the proceedings if he continued his behavior.  He clearly understood

10  what the court was saying and conformed his behavior to avoid being removed.

11        At the January hearing, the court questioned Dr. Roitman about Salisbury's comment to the

12  court that he understood he could not be tried if he was found incompetent.  After the testimony, the

13  court addressed Mr. Salisbury and asked if there was something he would like to say because of his

14  earlier attempts to interrupt the testimony.  Among other things, Salisbury stated that he believed the

15  court had misquoted his prior statement to the court (that a doctor had told him he could not stand trial

16  if he was incompetent) in questioning Dr. Roitman.  He quite obviously recognized that his earlier

17  statement to the court was being considered as evidence that he understood more than he was claiming.

18        Salisbury was extremely disruptive prior to the February 4, 2014 hearing.  He was brought into

19  the courtroom by the U.S. Marshals Service fifteen minutes before the scheduled 9:00 a.m. hearing.

20  The court was able to hear Salisbury over the court's audio equipment in chambers.  He yelled at the

21  Marshals, claimed his restraints were too tight, and was returned to the holding cell where the Marshals

22  readjusted his restraints.  He was returned to the courtroom and yelled at multiple U.S. Marshals present

23  to maintain order.  Forty to fifty times in rapid succession in staccato fashion, he yelled at the Marshals

24  "get your hands off me, get your hands off me, get your hands off me, etc." interspersed with "get your

25  f***ing hands off me."  When Salisbury continued this behavior, the court instructed the courtroom

26  deputy to make arrangements with the Marshals to make sure that the proceedings could be heard from

27  the holding cell adjacent to the courtroom over the court's sound equipment.  The Marshals again

28  removed Salisbury to the holding cell for this purpose.  As soon as Salisbury learned that he would

13

1    remain in the holding cell rather than the courtroom if he continued to be disruptive, he ceased being

2    disruptive.

3         The court took the bench, Salisbury was returned to the courtroom, the court made a record on

4    what the court had heard in chambers from the audio feed from the courtroom and addressed Salisbury.

5    The court again told Salisbury that he had the right to be present and that the court would prefer that he

6    remain in the courtroom for the hearing.  However, Salisbury was advised that if he became disruptive,

7    he would be removed and would have the opportunity to listen to the proceedings from the holding cell.

8    Salisbury remained compliant and listened to the testimony.

9         At the conclusion of the testimony the court addressed counsel to determine whether either side

10   had any additional evidence or testimony to adduce.  Neither side had anything further to offer.  The

11   court addressed Mr. Salisbury and asked whether he would like an opportunity to confer with his

12   counsel before concluding the hearing.  Mr. Salisbury responded "sure".  Arrangements were made to

13   return Salisbury to the Marshal's lockup so that Mr. Miceli could confer with him.  The court told Mr.

14   Miceli and Mr. Salisbury to take as much time as they needed to confer, and that the court would recess

15   until Mr. Miceli indicated they were ready to proceed.  A recess was taken until Mr. Miceli indicated he

16   and his client were ready to proceed.  Mr. Miceli advised the court that he had been able to confer with

17   Mr. Salisbury during the recess and had discussed the proceedings with him and that the defense had

18   nothing further to offer.  The court asked whether Mr. Miceli had discussed with Mr. Salisbury his right

19   to either testify or not.  Mr. Miceli answered affirmatively, but Mr. Salisbury denied the conversation

20   occurred.  The court therefore directly addressed Mr. Salisbury and advised him that he had the right to

21   testify, but could not be compelled to testify, and asked whether he wished to testify.  Mr. Salisbury did

22   not respond.  The court then asked whether Mr. Salisbury had anything to say before the court

23   adjourned.  Mr. Salisbury uttered the single sentence "there are no charges against me."  The court

24   asked whether he had anything else to say and Mr. Salisbury did not.

25        The court concludes that Salisbury is feigning an inability to understand the nature of the

26   proceedings against him, and is deliberately refusing to cooperate with his defense counsel.  The court

27   concludes that Salisbury is perfectly capable of assisting counsel in his own defense.  He worked with

28   counsel for many months after the initial charges were brought against him.  He was represented by the

1  office of the Federal Public Defender in the felon in possession charge from January 27, 2012, until he

2  asked for substitute counsel at a hearing on November 19, 2012.  He requested substitute counsel in the

3  related case after twice causing counsel to file a notice of intent to plead guilty and plea memoranda

4  which he subsequently repudiated, requested leave with withdraw, and that the matter proceed to trial.

5  He has been represented by Mr. Miceli since the Office of the Federal Public Defender was granted

6  leave to withdraw in his other case.  Nothing in the record in the felon in possession case suggests that

7  prior counsel had any reason to suspect Salisbury was incompetent.

8        Salisbury only began refusing to cooperate with Mr. Miceli and verbalizing a belief that there

9  were no charges pending against him shortly before the scheduled trial date in this case, and only after

10  Salisbury had agreed to accept a negotiated resolution of his charges for the third time.  Counsel for

11  both sides advised the court that the plea agreements contained preliminary sentencing guideline

12  calculations indicating Salisbury was likely to receive a lengthy prison sentence.   Salisbury began

13  engaging in increasingly bizarre behavior, refusing to cooperate with counsel, and claiming an inability

14  to understand at the June 17, 2013 visit with counsel to go over the written plea agreements, supporting

15  Dr. Gilbert's opinion and the court's finding that Salisbury is malingering to avoid the consequences of

16  his pending criminal charges.

17        Salisbury may very well suffer from some form of mental illness.  The court lacks the expertise

18  to make this judgment.  However, as Dr. Gilbert testified, people with mental illnesses can still be

19  competent to stand trial and to assist in their defense.  Dr. Gilbert and her staff concurred in the

20  diagnoses of antisocial personality disorder.  The court found Dr. Gilbert persuasive that a person with

21  antisocial personality disorder is nevertheless competent to stand trial and assist in his defense.  The

22  weight of the evidence does not support Dr. Roitman's diagnostic theory, which he acknowledges is

23  speculative, that Salisbury suffers from paranoid delusional disorder which prevents him from

24  cooperating with his counsel, and processing the consequences of the legal proceedings against him.

25        Dr. Gilbert did not review Dr. Roitman's report or testimony.  The court asked her whether she

26  had an opinion whether Salisbury's presentation while at MCC was consistent or inconsistent with a

27  diagnosis of paranoid delusional disorder.  Dr. Gilbert testified that Salisbury's presentation was not

28  consistent with a diagnosis of paranoid delusional disorder or any other known mental illness or

1   cognitive disorder.  Dr. Gilbert testified that Salisbury did not display symptoms of paranoid delusional
2   disorder.  Specifically, Dr. Gilbert testified that Salisbury displayed organized thought and goal-
3   oriented thinking. She explained that person a suffering from paranoid delusional disorder would be
4   incapable of organized, goal oriented thought.  Salisbury also did not display other delusional behavior
5   while at MCC San Diego such as claiming auditory or visual hallucinations and did not display
6   behavior indicating response to internal stimuli.  The court found Dr. Gilbert's testimony convincing
7   that Salisbury's repeated statements that there were no charges against him is not true delusional
8   thinking because his only delusional expressions are related to his legal cases.

9   Similarly, Dr. Sussman testified that although there are some references in the NSDC medical
10  records that could be construed as delusional thinking, such a stating he was refusing to take medication
11  because he feared it was adulterated and that he heard voices, neither Dr. Sussman, nor medical staff at
12  NSDC believe these were genuine delusions.  Rather, Dr. Sussman and his staff concluded that
13  Salisbury was engaged in deceitful conduct for secondary gain.

14  The weight of the evidence before the court is consistent with Dr. Gilbert's conclusion that
15  Salisbury's behavior is calculated and intended to avoid the consequences of his behavior and his
16  pending federal criminal charges.  The testimony and medical records the witnesses have relied upon
17  and testified about, support a finding that Salisbury has engaged in a pervasive pattern of failure to
18  conform to social norms, disregard for others and deceitfulness.  The court also found the testimony of
19  Dr. Sussman and Dr. Gilbert persuasive that Salisbury has not made genuine attempts at suicide, and
20  has expressed suicidal ideation for secondary gain, *i.e.,* to get something he wants or to avoid something
21  that he does not want.  While at MCC San Diego, Salisbury repeatedly claimed he was suicidal, then
22  denied he was suicidal, and then frankly admitted that he would "stay suicidal" or "just be suicidal til
23  the day I die" to avoid being housed with another inmate.

24  For all of the foregoing reasons, the court concludes that Salisbury has not met his burden
25  pursuant to 18 U.S.C. § 4241 of proving he is unable to understand the nature and consequences of the
26  proceedings against him, or to assist properly in his defense by a preponderance of the evidence.
27  Rather, the court finds that Salisbury is, and has been, feigning an inability to understand and
28  deliberately and voluntarily choosing not to cooperate with his counsel.  Accordingly,

16

1       **IT IS ORDERED** that Defendant's Motion for Hearing to Determine Mental Competency to

2    Stand Trial (Dkt. #25) is **GRANTED**.

3       **IT IS RECOMMENDED** that Salisbury be required to stand trial based on the undersigned's

4    findings that he is competent in that he has the sufficient present ability to consult with his lawyer with

5    a reasonable degree of rational understanding and has a rational as well as factual understanding of the

6    proceedings against him.

7       Dated this 26th day of February, 2014.

9                                    _____

10                           Peggy A. Leen
United States Magistrate Judge

17